542 P.2d 1195
**In the Matter of Jane DOE, a child.**
**No. 2013.**

Court of Appeals of New Mexico.
Nov. 12, 1975.

Charles A. Shaw, Asst. Children's Atty., Alamogordo, for appellant.

Albert J. Rivera, Alamogordo, for appellees.

## OPINION

HERNANDEZ, Judge.

The state brings this appeal from proceedings held in Lincoln County under the Children's Code, §§ 13–14–1 through 13–14–45, N.M.S.A.1953 (Repl.Vol. 3, Supp. 1973). We affirm.

The record discloses that during early October, 1974, the mother of Jane Doe initiated proceedings in Children's Court to obtain the return of her runaway daughter from the State of Colorado pursuant to the provisions of the Interstate Compact on Juveniles, §§ 13–16–1 through 13–16–8, N. M.S.A.1953 (Repl.Vol. 3, Supp.1973). At the time of filing this petition the mother had previously divorced the child's father, and had remarried. In her petition for requisition to return the runaway juvenile, Jane Doe's mother stated that the sixteen year old child had removed herself from the family home, and was now living with a Ms. Black, in Cortez, Colorado. In lieu of formal return under the interstate compact, Jane consented to voluntarily return herself to the jurisdiction of the Children's Court of Lincoln County, New Mexico.

Shortly thereafter on November 21, 1974, the Children's Court attorney for Lincoln County filed a second petition which states that Jane Doe was then being held in Children's Detention and further that " * * * she is a child in need of supervision in that she habitually disobeys the reasonable and lawful commands of her parents in that she refuses to return to her home in Ruidoso Downs * * *." The petition sought declaration of the girl as a ward of the court.

Following a hearing on the Children's Court attorney's petition, the court entered its order dated November 21, 1974, which provides in pertinent part:

(1) " * * * that the child is a dependent child and in need of supervision.

(2) " * * * that the child be * * * transferred to the custody of the officials * * * at the Girls' Welfare Home in Albuquerque * * * for a period of no more than Sixty days for social and psychiatric evaluation and testing."

Upon completion of this period of evaluation and testing, a second hearing was held on January 16, 1975, at which time the corrections· department's diagnosis was considered.

The result of this hearing was a judgment and order dated January 17, 1975, which recites that the child admitted her refusal to return to the home of her mother and stepfather and further provides:

(1) " * * * that the child is a Child in Need of Supervision * * *.

(2) " * * * that * * * the Child be * * * placed on probation for an indeterminate period not to exceed one year, under supervision of the Children's Probation Office of [the] Court * * *.

(3) " * * * that the custody of the Child be * * * temporarily placed with the New Mexico Department of Health and Social Services, for foster home placement."

The record next discloses that Jane Doe left the foster home in which she was placed and moved into the home of Ms. Black, who in the interim had herself returned from Cortez to Ruidoso Downs.

Subsequently, on April 10, 1975, the Children's Court attorney sought revocation of the girl's probation. After hearing on the revocation petition, the Children's Court entered its judgment and order dated April 17, 1975, which holds that Jane Doe

did violate the conditions of her probation agreement and which orders:

"1. That the Child remain on probation for an indeterminate period not to exceed one year, commencing the 20th day of November, 1974.

"2. That the New Mexico Health and Social Services Department be allowed to withdraw from any further custodial supervision * * *.

"3. That the Child be permitted to remain in the custody of Ms. * * * Black, and that the rights of the Mother of the Child to further custody be terminated.

"4. That the Child be permitted to remove to the State of Colorado with her guardian, Ms. * * * Black, after no more than 30 days from the date of hearing * * *."

The state alleges six points of error:

"POINT I: THE CHILDREN'S COURT LACKED JURISDICTION AB INITIO TO PROCEED HEREIN.

"POINT II: AWARD OF CUSTODY OF THE CHILD TO APPELLEE . . . BLACK WAS UNLAWFUL, AS A VIOLATION OF SUB-SECTION 13–14–31(C), N.M.S.A. (1953).

"POINT III: PARENTAL RIGHTS CANNOT BE SEVERED ABSENT A SHOWING OF INCOMPETENCE AS A PARENT, AND THE RECORD SHOWS NO SUCH FINDING BY THE COURT, NOR EVIDENCE ON WHICH TO BASE SUCH A FINDING.

"POINT IV: PROCEEDINGS IN THE CHILDREN'S COURT AMOUNTED TO A DENIAL OF DUE PROCESS OF LAW VIS-A-VIS THE CHILD'S MOTHER.

"POINT V: THE ONLY EVIDENCE IN THE RECORD TO SUPPORT THE DECISION OF THE CHILDREN'S COURT WAS THE STATEMENT OF THE CHILD, AND THIS IS INSUFFICIENT EVIDENCE ON WHICH TO BASE A CHANGE OF CUSTODY.

"POINT VI: THE EXPRESSED INTENT OF THE CHILDREN'S CODE IS TO PRESERVE THE FAMILY UNIT, AND THE DECISION OF THE CHILDREN'S COURT IS A DIRECT VIOLATION OF THAT INTENT."

As to Point I, we note that § 13–14–31(C), supra, provides:

"If a child is found to be in need of supervision the court may enter its judgment making any of the following dispositions for the supervision, care and rehabilitation of the child:

(1) any disposition that is authorized for the disposition of a neglected child; * * *"

■ We have here the anomalous situation of the state questioning the legal sufficiency of its own pleadings. If this were the usual adversary case, the state could not be heard to complain. Proceedings concerning the custody of minors are not adversary, however, since the court is not merely an arbiter but an advocate seeking to protect the welfare and interests of the minor.

■■ The state contends that the petition filed on November 21, 1974, makes no allegation of "a need for care and rehabilitation" and that absent this allegation the Children's Court did not have jurisdiction. In support of this contention the state cites *In Re Doe III*, 87 N.M. 170, 531 P.2d 218 (Ct.App.1975). The contention misreads *Doe III*, supra. The *Doe III* petition alleged a delinquent act, it did not allege the child was in need of care or rehabilitation. We add that the petition in *Doe III* did not allege that the child was delinquent. Either an allegation that the child was delinquent, or allegations of the two elements defined to mean a delinquent child was required. See § 13–14–3(O), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973). Here the child was alleged to be in need of supervision. A child in need of supervision means a

**509**

child in need of care or rehabilitation. Section 13–14–3(M), N.M.S.A.1953 (Repl. Vol. 3, Supp.1973). There is no merit to the claim that the petition was jurisdictionally deficient. Section 13–14–9(A)(2), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973).

Points II through V are likewise without merit and shall be considered together. As indicated at § 13–14–31(C)(1), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973), in proceedings leading to a finding of need of supervision, the Children's Court may enter a judgment making any disposition that is otherwise authorized for the disposition of a neglected child. We note that § 13–14–31(A)(3)(c), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973) provides that the Children's Court may transfer legal custody of a child to: "a relative or other individual who, after study by probation services or another agency designated by the court, is found by the court to be qualified to receive and care for the child."

The Children's Code, § 13–14–3(J), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973), defines "legal custody" as:

" * * * a legal status created by the order of a court or tribunal of competent jurisdiction that vests in a person the right to have physical custody of the child, the right to determine where and with whom he shall live, the right and duty to protect, train and discipline the child and to provide him with food, shelter, education and ordinary medical care, all subject to the powers, rights, duties and responsibilities of the guardian of the child and *subject to any existing parental rights and responsibilities;* an individual granted legal custody of a child shall exercise his rights and responsibilities as custodian personally unless otherwise authorized by the court or tribunal entering the order." [Emphasis Ours.]

The state contends that the Children's Court order of April 17, 1975, does not comply with § 13–14–31(A)(3)(c), supra. It maintains that all of the social agencies serving the Children's Court, recommended placement of the child with someone other than Ms. Black. The state argues, moreover, that there is no evidence Ms. Black would be "qualified to receive and care for" Jane Doe.

During the time that Jane Doe was at the Girls' Welfare Home in Albuquerque under the diagnostic order of the Children's Court, dated November 21, 1974, she was seen by numerous child development specialists, including the staff psychologist, a consulting psychiatrist, a case worker, a consulting physician and dentist, staff academic and recreational proctors, and the resident nurse. A six page report dated January 2, 1975, was sent from the Girls' Welfare Home to the Children's Court in Lincoln County. This report states in pertinent part:

" * * * [Jane Doe] is polite and well-mannered with staff and her peers and is responsible in doing whatever is expected of her. * * * [Jane's] biggest problem has been her moral naivete. * * * This naivete has * * * hindered [her] from viewing her mother or Ms. * * * Black in a realistic manner. Mother is seen as all bad since she became pregnant before her marriage to [stepfather]. [Jane] sees this as very unacceptable and maintains a high degree of anger against her mother. She feels a great deal of gratitude towards Ms. * * * Black for in [Jane's] eyes, Ms. Black was the one who kept the family together and her mother in line. After the relationship between Ms. Black and [Jane's mother] was terminated, [Jane] felt very insecure and rejected * * *."

After her divorce from Jane's father and prior to her remarriage in early 1974, the mother and Jane's brothers and sisters had lived together with Ms. Black for some six years. During four of those years Ms. Black and the mother had homosexual relations. However, the record also showed no evidence that at the time of the hearing on revocation of probation Ms. Black was engaging in homosexual activities. The evidence at that hearing was that Ms.

Black treated Jane Doe as a daughter and Jane considered Ms. Black as a mother. The evidence is that there had never been any sexual activity between Ms. Black and Jane.

The diagnostic report on Jane states:

"Ms. Black has been in contact with staff here and does seem genuinely concerned for [Jane's] welfare. Communication was initially allowed by letters only but this was terminated because we feel unsure of Ms. Black's motives and [Jane] seemed to over-identify with Ms. Black.

\*   \*   \*   \*   \*   \*

\*   \*   \*   \*   \*   \*

"In summary, [Jane] deals with her environment basically in a rather morally naive, conforming fashion. \* \* \* Because of this approach, [Jane] probably views life currently in terms of black and white, right or wrong and has problems accepting anything that doesn't fit this schema.

\*   \*   \*   \*   \*   \*

" \*   \*   \* The only negative responses are to items dealing with her mother. \* \* \* [Jane's] strong feelings and desire to live with Ms. \* \* \* Black come out forcefully.

\*   \*   \*   \*   \*   \*

" \*   \*   \* She feels her mother has one set of standards for herself and a different set for [her]. \* \* \* [Jane] sees her mother as more interested in caring for her own needs, placing the needs of her children second. \* \* \* [Jane] has extremely high, idealistic moral standards that originate from two sources. One is the example and [Jane's] identification with it set by her mother's companion for several years, Ms. Black. The other is a reaction to the shame and embarrasment [Jane] has towards her mother's present behavior."

Jane's mother gave birth very soon after her marriage in early 1974.

The state argues that the Children's Court did not comply with § 13–14–31(C)(1), supra, because its order of April 17, 1975, conforms to neither the testimony of Mr. DeLeon, a Social Service worker nor to the testimony of Mrs. Maria Foster the children's Probation Officer for Lincoln County. The state further contends that the court's order of April 17, 1975, was inconsistent with the reports furnished to the court by the other social service agencies, all of which recommended placement of Jane Doe with someone other than Ms. Black. The answer to this argument is that the court was not required to conform its order to their recommendations. Section 13–14–31(A)(3)(c), supra, provides that the court can transfer legal custody to "a relative *or other individual* who, after study by probation services or another agency designated by the court, *is found by the court* to be qualified to receive and care for the child." [Emphasis Ours.] The excerpts quoted from the report of the New Mexico's Girls' School reveal substantial evidence that Ms. Black was as fond of Jane as Jane was of her. The record also reveals that Ms. Black had helped to rear Jane and that she had been a positive influence over her. We believe that these were the factors considered by the Children's Court in reaching its decision, and we find no basis in them for concluding that the court was in error in deciding as it did. The state contends that the award of custody of Jane to Ms. Black violated § 13–14–31(A)(3)(c), supra, in two ways: that no agency designated by the court had made a study of Ms. Black's qualifications to receive and care for Jane and the court did not so find. Our answer is that these contentions were never raised at the revocation hearing and in awarding custody to Ms. Black the court impliedly found Ms. Black qualified to have custody of Jane.

■ The state's claim that parental rights to custody cannot be taken away absent a showing of incompetence on the part of the parent or parents is an overly narrow reading of the statute.

Section 13–14–31(C), supra, places no such requirement upon the child in need of

supervision. The court in its judgment and order of January 20, 1975, made such a finding and placed Jane on probation.

 The state's claims concerning parental rights and "due process" as to Jane's mother are matters which the mother could raise in appropriate proceedings. The mother was summoned, appeared and testified at the proceedings in the Children's Court. She however, has not appealed. See § 13–14–36(A), N.M.S.A.1953 (Repl. Vol. 3, Supp.1973). The court's order transferring custody is authorized under § 13–14–31, supra, "to protect the welfare of the child." The state, prosecuting the revocation petition, can appropriately challenge the custody arrangements made by the court. Those custody arrangements, however, are of limited duration. Section 13–14–35(B), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973). Thus the effect of the custody arrangements on parental rights is of limited duration. Because of this limited effect, we hold the issue of parental rights is one to be raised by the parent and not by the state. "A violation of due process can be urged only by those who can show an impairment of their rights in the application of the statute to them." *State v. Hines,* 78 N.M. 471, 432 P.2d 827 (1967).

 The state's sixth and final point is that the court violated the spirit and intent of the Children's Code by placing Jane in the custody of Ms. Black. In support of this contention the state cites § 13–14–2(A), (B), (C), N.M.S.A.1953 (Repl.Vol. 3, Supp.1973):

"The Children's Code [13–14–1 to 13–14–45] shall be interpreted and construed to effectuate the following expressed legislative purposes:

A. to preserve the unity of the family whenever possible and to provide for the care, protection and wholesome mental and physical development of children coming within the provisions of the Children's Code;

B. consistent with the protection of the public interest, to remove from children committing delinquent acts the consequences of criminal behavior and to substitute therefore a program of supervision, care and rehabilitation;

C. to achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents *only when necessary for his welfare* or in the interests of public safety; . . .." [Emphasis Ours.]

It is implicit in the language of the Children's Code that the Children's Court is vested with a broad discretion in hearing and deciding matters under it. The history of this case amply demonstrates that the subject child felt compelled to run away from her mother's household and that she would in all likelihood continue to refuse to live with her mother. In lieu of the compromise achieved by the Children's Court herein, we believe it can be reasonably predicted that Jane would continue her previous conduct. This being so, it is our opinion that exercise of the court's discretion should not be disturbed on appeal in the absence of a showing of manifest abuse. We find no abuse in this instance. See *In Re Guardianship of Howard,* 66 N. M. 445, 349 P.2d 547 (1960).

The judgment and order appealed from are affirmed.

It is so ordered.

WOOD, C. J., and LOPEZ, J., concur.